SMITH & ELLIOTT, Respondents, v. MISSOURI, KANSAS & TEXAS RAILWAY COMPANY *et al.*, Appellants.

Kansas City Court of Appeals, April 30, 1894.

**Common Carrier:** DUAL AGENTS: WHICH PRINCIPAL LIABLE. Defendant and the Wabash company had at Hannibal one freight agent and one yard master for both roads. In the shipment on

defendant's road of stock that was to pass over the Wabash, defendant telegraphed from Moberly to the joint freight agent at Hannibal of the fact, who communicated it to the joint yard master and he gave notice to the train master of the Wabash at Springfield, Illinois. As regards the car of cattle in suit, defendant notified the joint freight agent at Hannibal that it would arrive at 8 P. M. The joint yard master notified the Wabash train master of its expected arrival and the train master in turn ordered him to hold the car for the next morning train and to cancel the late night train. The custom was when the joint agents received a car from an incoming train they did so as the agent of the road over which it was to continue its journey and, when so received, they only recognized orders in regard to such car from such road, and as to such car did not act for the road which brought it in. On the arrival of the car in suit the joint yard master turned the cattle into the stock yards and kept them for the morning train over the Wabash. *Held*, in receiving the car and turning the cattle into the stock yards, the yard master was the agent of the Wabash and not of the defendant, and the defendant was not liable for any injury resulting to the cattle from being placed in the stock yards.

*Appeal from the Howard Circuit Court.*—HON. JNO. A. HOCKADAY, Judge.

REVERSED.

*Jackson & Montgomery* for appellants.

(1) The court erred in refusing to give the demurrer to the evidence prayed by defendants upon the close of plaintiffs' evidence. The evidence did not show any negligence on the part of any one. The stock yards did not belong to defendants, nor were they controlled by them. The defendants did not order or require the plaintiffs' cattle to be unloaded into those yards, nor did defendants' agents unload them there. Defendants' duty and liability ended when the cattle reached Hannibal. (2) The court further erred in afterwards permitting plaintiffs to read that letter. (Abstract, pp. 149 and 150.) It was enabling them to manufacture evidence for themselves.

*S. C. Major* and *Draffen & Williams* for respondent.

The appellant's third point assumes that there was no negligence on the part of any one, and upon that basis claims that a demurrer to the evidence should have been sustained. The court below and the jury did not concur in that view of the facts.

ELLISON, J.—The plaintiff shipped a car load of cattle over defendant's road from Fayette to Hannibal, Missouri, consigned to C. Mayfield, at Jacksonville, Illinois. The shipment was by special written contract. Defendant's road terminated at Hannibal and there connected with the Wabash railroad, which latter road transported the cattle to Jacksonville, under the contract mentioned. They arrived at Hannibal between 9 and 10 o'clock P. M., of the day they were shipped from Fayette and were not immediately continued in transit by the Wabash. They remained at Hannibal that night and were taken to Jacksonville the next day by the Wabash company. Shortly after their arrival at Hannibal and upon its being ascertained that they were not to be taken on that night, they were taken to the stock yards to be kept over night and watered and fed. The plaintiffs charge that the stock pens were infected with the cattle disease known as Texas fever, and that this was known to defendant, and that their cattle became infected with the fever, several of them dying and others losing in market value; whereby plaintiffs were damaged, etc. Plaintiffs recovered judgment.

The result of our consideration of this case is to view it as turning here on the question whether defendant's servants turned the cattle into the stock yards to be kept during the night. Plaintiffs affirm and defendant denies. There is no attempt made by plaintiffs to

hold defendant for the acts of any one other than its own servants. The evidence discloses without dispute that at Hannibal there were employees representing three different principals, viz.: the defendant, the Wabash railway company and the owner of the stock yards. It is with the two railroad companies that we have principally to deal in disposing of the question. The evidence shows that these companies had a joint freight agent and a joint yard master at Hannibal. That the one freight agent, G. K. Tozer, acted for both roads; that G. W. Henwood acted for both roads as day yard master, and T. J. Doyle acted for both roads as night yard master; that it was the custom for the defendant company to notify the Wabash company at Hannibal if they had any freight for the latter company going east of Hannibal; that this notice was generally telegraphed from Moberly, Missouri, to the joint freight agent at Hannibal. On this notice being communicated to the joint yard master he usually gave notice to the train master of the Wabash road at Springfield, Illinois, the latter having the control of the running of trains.

It was shown without contradiction that these joint servants or agents acted in separate capacities for their respective principals, kept separate accounts with them and obeyed the separate orders from each company as such orders had reference to each company's business. It was further shown that the yard master handled the cars or trains, as they would arrive at Hannibal, for both roads and that both roads used the same tracks to and from the stock pens and used as occasion required the engines of either road.

The cattle, in this instance, were turned into the cattle yards or stock pens to be kept over night under the direction of the night yard master and the question in reality is, for whom was he acting, the defendant,

or the Wabash company? It seems that there were three freight trains over the Wabash which are connected more or less with the question. These trains were known as No. 98, which left Hannibal early in the evening, No. 96, which was to leave later in the evening or night, and No. 76, which was to leave the next morning. It also appears that when the Wabash was notified of shipments consigned over its road it would wait on their arrival at Hannibal so as not to make delay, especially of live stock trains. On the day of shipment of these cattle, December 12, 1889, the Wabash train master at Springfield, Illinois, at 3:40, P. M., and before receiving notice of this car of cattle being on the way to Hannibal from Fayette over defendant's road consigned to Jacksonville on his road, telegraphed Henwood the joint day yard master, ordering him to run out No. 98 on time. This left then but the one train, No. 96, to go later. At 4:07, P. M., the defendant's division superintendent at Moberly, Missouri, notified Tozer, the joint freight agent at Hannibal, that the car of cattle in controversy, for Jacksonville over the Wabash would arrive at Hannibal at 8 P. M. and were to go through without feed. Doyle, the joint night yard master, then, at 7:50 P. M., notified the Wabash train master at Springfield, Illinois, that he would have the cattle in controversy for shipment to Jacksonville. Doyle in a few minutes thereafter got a telegraphic order from the Wabash train master at Springfield to hold this car of stock "for 76, and cancel 96." This was explained to mean that train No. 96, would not be run out and the stock were to be held all night to go out next morning on 76. Each of the joint agents testified, and they were not disputed, unless by a circumstance to which we shall refer, that when a car of freight came over the defendant's road for continued transit over the

Wabash and they received the car from the incoming train, they did so as the agent and servant of the road over which it was to continue in transit. That when so received and taken charge of, such agents only received and only recognized orders from such road. That they in such state of case did not act for the road which had brought the car in. Now in this case the car in controversy had been reported to the Wabash train master at Springfield and he had assumed control of it, or, more properly speaking, had given orders to the joint night yard master at Hannibal (beyond doubt as servant of the Wabash) to assume charge of the car and detain it through the night and send it out in the train the next morning. In obedience to this order the night yard master did take charge of the car from the defendant company and as he was to keep it over night, he, in his discretion, had the cattle unloaded into the stock yards. We have no doubt of the showing which the evidence makes as to this and are of the opinion that it is conclusive that defendant's servants or representatives did not turn the cattle into the yards, and of course defendant is not responsible for the consequences resulting. The circumstance to which we above referred is this: the witnesses said in answer to certain questions that they were defendant's agents and that they had at times done a variety of things in connection with freight of either road for the other; but none of this can, with fairness, be said to refer to or qualify or leave any inference against their version of what they did in this instance. Indeed it seems to us to be shown beyond any question that the Wabash train master ordered the car held at Hannibal over night. To order it to be held means to assume charge of it. The order was obeyed by detaining the car and unloading it into the stock pens.

We must, therefore, reverse the judgment. All concur.